JONKER, District Judge,
concurring.
I agree fully with the lead opinion’s analysis and conclusion that Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609 (6th Cir.1998), rather than Int’l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Yard-Man Inc., 716 F.2d 1476 (6th Cir.1983), establishes the appropriate framework of review here, and I have no objection to remanding the case to the District Court for application of the Wilkins framework in the first instance. I do not believe a remand is necessary, however, because in my view a change in the framework of review does not alter the correct outcome in the case. I would readily vote to affirm the District Court’s original decision now under the Wilkins standard.
The key insight of the District Court, and the practical hinge of its decision, was recognition that this case involves a decision to terminate already awarded benefits, not a decision to grant or deny benefits in the first instance. In my view, this is a critical difference. Everyone agrees Mr. Price originally qualified for and received an award of complete disability benefits in 1990. At that time the Plan by its terms promised to pay the benefit all the way to early retirement age, as long as the qualifying participant remained disabled. Everyone further agrees that Mr. Price later qualified for and received an award of *299 the Plan’s occupational disability benefit in 2001. At that time the Plan by its terms promised to pay this benefit all the way to early retirement age, as long as the qualifying participant remained disabled. And everyone agrees that Mr. Price remains disabled to this very day. Even so, the Plan stopped paying Mr. Price the promised disability benefit on January 1, 2007, not because he reached early retirement age, and not because his disability status changed, but solely because the Plan adopted an amendment after Mr. Price’s award that cut the occupational benefit off effective December 31, 2006. Of course the amendment applies by its terms to anyone who first qualifies for the benefit after the date of the amendment; the Plan had no obligation to continue to offer the same package of welfare benefits to potential beneficiaries that it had previously offered. But for someone like Mr. Price, whose disability benefit was first awarded by the Plan before the amendment, when the Plan promised to pay the benefit until the later of early retirement age or the end of disability status, I believe the amendment has no proper impact at all.
What happens when the Plan awards a disability benefit to a qualified participant like Mr. Price? In my view, when the Plan initially decides that a participant qualifies — that the participant has worked the required ten years, has demonstrated disability status and has otherwise satisfied the requirements for coverage — and awards the disability benefit, something fundamentally changes: the Plan’s disability benefit package generically offered to all qualifying participants confers enforceable contractual rights and obligations on the Plan and on the particular qualifying participant. Those contract rights and obligations, in my view, are defined by the terms of the Plan in effect at the time of the initial qualification decision. It is as though the Plan effectively issues the participant a benefit package IOU promising to pay the terms of the benefit in effect at the time of qualification. In the case of Mr. Price, the benefit package promised payment until the later of early retirement age or the end of disability status. The Plan remained free to require Mr. Price to demonstrate his continuing disability status from time to time, because the Plan terms said so at the time Mr. Price originally qualified. But each such review was not a new decision to award benefits; rather, it was a simple implementation of the terms of the benefit package conferred upon Mr. Price in the first instance. The decision to award the benefit package was a single and discrete event that was complete at the time the Plan made the award decision, and that conferred enforceable contract rights and obligations on each party.
The lead opinion is quite correct to observe that I have cited no case or statute that describes or applies the disability benefit award in the terms I have just used. It is, I believe, equally correct to observe that the lead opinion cites no authority that applies the general rules upon which we all agree to the particular fact pattern we have here. In my view, citations to a particular case or statute cannot settle the precise dispute here because there is no such authority, at least none that the parties have cited or that our independent research has uncovered. It is the apparent dearth of on point authority that leads to my effort to articulate for the first time a framework of analysis that is both faithful to the agreed general rules and at the same time respectful of what I believe are the real, reasonable and enforceable contractual expectations of the parties.
The framework I am advocating has the salutary practical effect of treating this case, which provides disability benefits through a trust fund created under a col *300 lective bargaining agreement, in the same way federal courts routinely treat ERISA disability cases involving benefits provided through a private insurance contract. Such cases are a staple of the federal district court docket. I know of no such case in which any party or the court has suggested that a change in disability benefits offered by the employer’s disability Plan reaches back to change the terms of a previously awarded disability benefit under the terms of the Plan, and the insurance policy funding the Plan, in effect at the time of the initial award. The parties and the courts appear to assume — properly in my view — that the governing terms of the disability award are the ones in effect at the time of the original award. In my view, a union employee like Mr. Price, whose disability benefit is funded by a Trust created under a collective bargaining agreement, rather than by a private insurance contract, reasonably expects nothing less: the terms of the Plan in effect at the time of the initial benefit award should define the contractual rights and obligations of the parties.
Using the terms of the Plan in effect at the time a participant qualifies for the initial disability award also works with the other welfare benefit funded through the Trust in this case. The Plan at issue here provides for not only pension and disability benefits, but also a death benefit. A death benefit, like a disability benefit, is a welfare benefit under ERISA and therefore subject to the general rule against vesting of welfare benefits. Suppose a covered and qualified employee dies and triggers the death benefit. Does the Plan have the lawful power to amend the terms of the death benefit after the employee’s death in a way that would prevent payment of the benefit? Under the lead opinion’s analysis, it would seem the Plan could do so because the amendment would allow the Plan to deny what had been in place on the original qualifying date. In my view, the Plan would be obligated to pay the death benefit if the terms of the Plan in effect on the qualifying date — the date of death — ■ required it. Once again, I believe that result is consistent with both the agreed general rules governing ERISA welfare benefits, and the reasonable contractual expectations of the parties.
Finally, if the lead opinion’s view of the disability benefit prevails, then I would submit that union employees whose disability benefit is protected only by a Trust like the one here had better purchase their own private disability insurance policy, too, because they really do not have meaningful disability protection. I say that, because once a person is disabled, they are by definition not able to engage in income-generating work, or at least not income-generating work of the kind they are accustomed to performing. Nor, obviously, are they able to purchase private disability insurance after they are already disabled. If the Trust obligated to fund their promised disability benefit also has the power to amend the Plan after the qualifying disability event in a way that cuts off the benefit even for people who have already qualified, then there is really no reliable disability protection at all. Mr. Price, of course, is in exactly that position if the lead opinion’s view of the Plan’s power prevails.
The lead opinion suggests that the well-established difference under ERISA between pension benefits, on the one hand, and welfare benefits — including disability benefits — on the other hand, may justify the Plan’s decision here to revoke the disability benefit package it originally awarded to Mr. Price. I respectfully disagree with that because in my view it overlooks a critical difference between the Plan’s undeniable power to change the terms of a generally applicable welfare benefiN-in *301 eluding a disability benefit — prospectively for people who have not qualified for the benefit, on the one hand; and the Plan’s quite different claim to have the unilateral power to change or even eliminate disability benefit packages it has already awarded. I see nothing in the ERISA welfare benefit cases, including those dealing with retiree health care benefits, that suggests the Plan’s undisputed power to make prospective changes in available benefit packages not yet awarded includes the power to unilaterally change or eliminate a benefit already conferred. A disability benefit award is not a recurring annual decision; rather, it is a one time decision to grant or deny the benefit package followed by ongoing administration — including periodic review of disability status — of any package awarded.
For this reason, I do not believe it is even necessary to reach the reasonably possible constructions of the amendment provision of the Plan. I simply do not believe it applies by its terms to this unique situation. The provision permits amendments to the benefits offered by the Plan, but this in my view is not the same thing as changing or eliminating a particular benefit already conferred. Nothing in the Plan language purports to permit a retroactive change to the contractual terms of a benefit already conferred. Once the Plan awarded Mr. Price the disability benefit, I believe the Plan was contractually obligated to pay the benefit by the terms as defined on the date of the award. And in this case these terms did not permit the Plan to cut off benefits before Mr. Price reached early retirement age as long as he remained disabled, as all agree he is to this very day.
Accordingly, I would readily vote to affirm the District Court now, but I do not object to a remand to give the District Court the first opportunity to apply the Wilkins standard to this record, or to any expanded record the District Court may find proper.